**BALL et al. v. MERRIMAN et al.***
(No. 863.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 20, 1922. On Rehearing Dec. 20, 1922.)

**1. Waters and water courses ☞183½—Special benefits warranting inclusion of land in water district.**

Special benefits which would warrant the inclusion of land in a water district under Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), may consist of increases in the value of the land, or especially adapting it to a purpose which enhances its value, and the question is not to be determined by its present use.

**2. Waters and water courses ☞183½—Fresh water district not invalid because some lands will not receive water.**

The organization of fresh water supply district No. 1 of Jefferson county under Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), was not invalid because rural lands included therein did not, and probably will not, receive any of the water brought into the district.

**3. Waters and water courses ☞183½—Inclusion of property supplying own water in district does not render district invalid.**

The inclusion in fresh water supply district No. 1 of Jefferson county, organized under Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), of land and property of great value and extent, which has provided itself with an abundant supply of water and waterworks system at great expense, did not render the organization of the district invalid.

**4. Waters and water courses ☞183½—Fresh water supply districts municipal corporations.**

A fresh water supply district organized under Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), is a municipal corporation, and is governed by the laws relating to that class of corporations.

**5. Waters and water courses ☞183½ — Disproportionate benefits held not to render fresh water district invalid.**

The fact that the city of Port Arthur has a large majority of the voting strength of fresh water supply district No. 1 of Jefferson county, organized under Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), and that they might vote against extension of water mains to rural properties in the district, and that some of the lands will be disproportionately benefited, does not render such district invalid.

**6. Waters and water courses ☞183½—Fresh water supply district held organized for conservation of natural resource.**

It cannot be said that fresh water supply district No. 1 of Jefferson county, organized under Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), was not organized for the purpose of conserving any natural resource, or that the primary purpose of the district was to develop Port Arthur and its environs along artificial lines, and it is immaterial that the water to be conserved is out of the district and is to be brought into the district, in view of Const. art. 16, § 59.

**7. Waters and water courses ☞183½—Promoters of fresh water supply district held not to have abused power in organization.**

Promoters of fresh water supply district No. 1 of Jefferson county, organized under Acts 1st and 2d Called Sess. 36th Leg. (1919)

───
☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted January 31, 1923.

c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), *held* not to have abused the power given them in fixing the boundaries of the district and in including certain properties therein.

**8. Waters and water courses ☞183½—Motives and intentions of promoters establishing fresh water supply district immaterial.**

As fresh water supply district No. 1 of Jefferson county was formed in the manner provided by Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), the motives and intentions of its promoters are immaterial and do not affect its legality.

**9. Taxation ☞38—Fresh water supply district a conservation project within Constitution authorizing taxation.**

The purpose of Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), under which the fresh water supply district No. 1 of Jefferson county was organized, was "conservation," as defined by Const. art. 16, § 59, authorizing an unlimited ad valorem taxation for objects of conservation and reclamation.

**10. Constitutional law ☞48 — Invalidity of statute must appear beyond a reasonable doubt.**

Unless it appears beyond a reasonable doubt that the Legislature has exceeded its constitutional grant of authority, its act must be held constitutional.

**11. Waters and water courses ☞182—Constitutional provision held not to limit boundaries of conservation water districts.**

There is nothing in Const. art. 16, § 59, giving direction to the Legislature as to how conservation districts shall be organized, nor limiting the boundaries of such district, and there is no suggestion that county lines or the lines of any other political subdivision shall be considered in establishing such district, and it is for the Legislature to determine how a water district should be organized and how the boundaries should be determined.

**12. Municipal corporations ☞870—Taxation ☞38—Waters and water courses ☞182—Statute authorizing water supply district not invalid as permitting taxation for private purpose.**

Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), under which fresh water supply district No. 1 of Jefferson county was organized, and which was passed under Const. art. 16, § 59, is not invalid as permitting taxation for other than a public purpose, under Const. art. 8, § 3, or as authorizing any political corporation or subdivision to lend its credit to any individual or association under Const. art. 3, § 52, though in its operation certain individuals may derive a special benefit, and though the promoters selected the territory to be included in the district, since courts have authority to nullify their act if they abuse the authority fixed in them.

**13. Constitutional law ☞64—Statute permitting promoters to fix boundaries of water district, no delegation of legislative power.**

Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), by giving promoters power to fix the boundaries of a fresh water supply district, has not delegated to such promoters legislative power, but has only enacted conditions, upon performance of which the corporation should be regarded as organized with the powers mentioned and described.

**14. Constitutional law ☞283—Statute permitting promoters to lay off fresh water supply district resulting in taxation not deprivation of property without due process of law.**

Acts 1st and 2d Called Sess. 36th Leg. (1919) c. 48 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5107—180 to 5107—266), under which fresh water supply district No. 1 of Jefferson county was organized, is not invalid as depriving persons of property without due process of law, in that it authorizes private promoters to lay off a district and have all the lands in it, subject to ad valorem taxation for the purpose of providing a direct benefit to some locality within the district, provided the taxes are "equitably distributed" as required by Const. art. 16, § 59.

Error from District Court, Jefferson County; E. A. McDowell, Judge.

Information in the nature of a quo warranto by Marvin Scurlock, County Attorney of Jefferson County, on the relation of W. R. Merriman and others, against M. T. Ball and others, constituting the Board of Supervisors and the Tax Collector of Fresh Water Supply District No. 1 of Jefferson County, charging usurpation, and praying for a judgment of ouster. Judgment for relators, and defendants bring error. Reversed and rendered.

Sonfield, Nall & King, of Beaumont, and J. W. Williams, of Port Arthur, for plaintiffs in error.

A. D. Lipscomb, and W. R. Blain, both of Beaumont, and Holland & Holland, of Orange, for defendants in error.

WALKER, J. This was an information in the nature of a quo warranto, filed in one of the district courts of Jefferson county by Marvin Scurlock, county attorney of Jefferson county, upon the relation of W. R. Merriman, J. M. Hebert, Oscar Whittington, Hugh Kitchen, G. R. Thomas, the Texas Company, and Walter Beaumont, against M. T. Ball, A. S. Bailey, G. E. Bliss, S. E. Gifford, C. C. Hawkins, and R. S. Stewart, constituting the board of supervisors and the tax collector of fresh water supply district

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

No. 1 of Jefferson county, charging usurpation, and praying for a judgment of ouster. On a trial to the court without a jury, judgment was entered in favor of relators against respondents that fresh water supply district No. 1 was invalid, and that respondents were guilty of usurpation, and that they pay a fine of one cent to the state of Texas for such usurpation. This case is before us on writ of error sued out by respondents. In this opinion, for convenience, we designate the plaintiffs in error as respondents and the defendants in error as relators, that being their relations in the lower court.

Fresh water supply district No. 1 of Jefferson county, herein referred to as the district, was organized under the provisions of chapter 48, p. 107, Acts of the First and Second Called Sessions of the Thirty-Sixth Legislature, arts. 5107—180 to 5107—266, inclusive, Complete Texas Statutes 1920, referred to herein as the act. In the organization of the District, it is conceded—at least it is not questioned—that all the provisions of the act were complied with. In their amended information relators attacked the act on the ground that it was unconstitutional, and was insufficient to support the organization of the district, and, if in error in that contention, that the district as organized was illegal and void for the following reasons (quoting from respondents' brief):

"(1) The organization of the district was planned in fraud of the rights of relators and many others owning land within the district, the purpose being to supply only the residents of the city of Port Arthur and its suburbs with fresh water, the lands outside of the city of Port Arthur and its suburbs being included within the district for the sole purpose of taxation, it not being intended to afford any of the benefits of the water supply to such lands.

"(2) That the plan or scheme of improvement adopted is incomplete, partial, and unfair, in that it would be impossible and impractical thereby to distribute the fresh water throughout the district in such manner as to benefit directly or indirectly the lands within the district outside the city of Port Arthur and its suburbs.

"(3) That the lands of relators other than the Texas Company and the lands of many others, not parties to the suit, are so situated as to render it impossible that they will receive any benefit from the proposed improvement.

"(4) That the relator the Texas Company has at its own expense provided itself with a supply of fresh water adequate for all its needs, and much of its property included within the district is so situated as to be inaccessible to the contemplated improvement, so that its property would not be benefited by such improvement.

"(5) That the boundaries of the district were fixed by petitioners for the district in such manner that relators and the other owners of property in the proposed district outside and beyond the limits of the city of Port Arthur would be unable to defeat the organization of the district, or the authority to issue bonds in elections held for that purpose, because the city of Port Arthur contains within its boundaries 80 per cent. of the qualified voters of the entire district.

"(6) The bonds authorized by the election are an amount only sufficient to cover the estimated cost of supplying fresh water to Port Arthur and its municipally owned waterworks, and added revenue can be raised only through an election; and, since 80 per cent. of the qualified voters reside in Port Arthur, this majority would naturally be opposed to any extension of improvements which would benefit relators.

"(7) That the territory included in the district is nine-tenths rural and pasture land and unsuitable and inappropriate for any community design or plan for a fresh water supply for domestic and commercial uses, and no system of improvement could be adopted that would be just and reasonable or appropriate.

"(8) The act provides for an ad valorem tax upon all lands in the district, and the boundaries of the district having been arbitrarily fixed so as to include therein lands which it was not contemplated would receive any benefit, the system of ad valorem taxes cannot be applied with uniformity and equality within the district.

"(9) That the Constitution authorized taxation only for conservation and reclamation of the natural resources within a given division or territory for the benefit of the division or territory in which the resources conserved or the wealth reclaimed are situated, and the scheme or plan adopted does not contemplate conservation of natural resources within the district, but a diversion of such resources from without the district for distribution within the district."

Respondents thus summarize their answer:

"Respondents demurred generally to the amended original information, filed numerous special exceptions and answered fully. They denied that they were exercising the rights and franchises without lawful warrant or authority, but that they were acting as the duly elected officers of fresh water supply district No. 1 of Jefferson county, a governmental agency, body politic and corporate, duly formed and organized in the manner as provided by the act of the Thirty-Sixth Legislature, enacted at its second called session, being chapter 48, approved the 28th day of July, 1919, said act being passed in virtue of section 59 of article 16 of the Constitution of the state of Texas, adopted as an amendment on the 21st day of August, 1917. Respondents specifically set out the proceedings had and taken in the formation of the district, and averred the regularity of all such proceedings and full compliance with all conditions precedent to the organization, as well as all steps taken after the organization of the district."

The trial court sustained all of respondents' special exceptions to relators' amended information, in as far as they called in question the constitutionality of the act, but over-

ruled all others, and, in support of his judgment holding the district void and illegal, filed conclusions of law and fact supporting the allegations of relators' information, as above summarized.

We believe the following facts are not controverted by the record:

(1) Fresh water supply district No. 1 of Jefferson county includes the school districts of Port Arthur and Port Neches, both districts being wholly within Jefferson county, and its boundaries are coincident with the boundaries of the two school districts.

(2) The district as organized contains the city of Port Arthur, with a population of about 30,000, and the town of Port Neches, with a population of about 1,500. The district contains about 45,300 acres of land. Port Arthur and its suburbs, together with Port Neches, contain about 5,257 acres of land. The balance of the land in the district is rural and is used for farming and stock grazing. The tax values of the district were shown to be as follows: Real estate and personal property in Port Arthur, $8,521,756; real estate in the two school districts outside of Port Arthur, $29,000,000; property of the relator Hebert, $83,000; property of the relator Texas Company, $14,789,000; property of other relators in district, $23,000.

(3) The district is bounded on three sides by navigable waters which constitute one of the greatest ports in the United States. The land of the district is very level, no mountains, hills, or deep gullies, and slopes gradually from Port Neches towards Port Arthur, a distance of 9 or 10 miles, having a fall of about 15 or 16 feet in this distance.

(4) This district has developed very rapidly within the last 20 years. The city of Port Arthur has grown from a very small village to its present size. Port Neches has grown up. Rural land values in the district have increased from $10 or $15 per acre to as high as $1,000. This development of the district has been due to the commercial and industrial enterprises now located within the limits of the district, and the prosperity and growth of the district depend on the prosperity of these enterprises and the location of new enterprises.

(5) All parts of the district now have an abundant supply of fresh water from wells and cisterns, except the city of Port Arthur and its suburbs. The Texas Company has its own supply of fresh water, secured at a cost of approximately $250,000. Port Arthur for years has secured its supply of fresh water from deep wells located at Port Neches, but during the last few years these wells have become salt, and the water is now very bad and often not fit for use. Much of the water used is brought in barges from a great distance. The character of the water now being supplied by the wells and Port Ar-

thur's source of supply is thus described by Mr. Bliss, a witness for respondents:

"When I was mayor, we drilled a few water wells at Port Neches and extended the water line to Port Arthur. It was through that line that we piped this fresh water into Port Arthur and distributed it to the citizens of Port Arthur and the industrial enterprises surrounding Port Arthur. The city of Port Arthur paid for the drilling of those wells, and the Texas Company and the industrial plants that used the water paid for the water they got. Mr. Hebert nor any of those people residing in that community around there did not receive any direct benefit from those wells that we drilled at Port Neches. That water supply did not play out, but the quality of the water did. The water contained a certain amount of salt, and it is really unfit for any purpose. The stock won't drink it, and you can't cook with it, and you can't drink it. The children going to school had to take cistern water in bottles to drink or do without water until they got home. They couldn't use that water in their chemical tests at school, and the industrial plants had to go elsewhere for water for boiler purposes. Mr. Hebert and those living in that immediate community surrounding him did not suffer any inconvenience from that. They made no complaints that I know of. That, and other conditions, is what brought about the idea of this fresh water district that is there now. The industrial situation is the chief factor. I wouldn't say that Mr. Hebert and those people living in that rural community around him would not be benefited by this fresh water project, because I think they would in this way, it would make their property desirable for industrial sites. The Board of Trade at Port Arthur did not consider their property as such; it was our railroad engineers. It was on account of the industrial plants that were in existence around Port Arthur and the citizens of Port Arthur who had to drink this water that made it absolutely necessary for us to look for a fresh water source. It was an imperative necessity. That is what brought about the original idea of forming this district.

"At the present time I am connected with the Gulf Refining Company. There was a time when we brought water from the Delaware river; that water was hauled some 1,600 miles in our boats. We did not haul this water down here at an unlimited taxation to the people; it was bought and paid for by the Gulf Refining Company."

Again by Mr. Ball:

"I am acquainted generally with the geographical condition of this proposed fresh water district. There is not an abundant supply of fresh water in the district at this time. At this time the Gulf Refining Company gets its drinking water for its men from Bonami, La.; they bring that water in there in tank cars. Bonami, La., is situated on the K. C. S. line. Bonami, La., is in the neighborhood of a hundred miles from Port Arthur."

(6) Port Arthur's need of a supply of fresh water has been a source of much concern to

its citizens and has been agitated in the city since about 1919. Within the last few years the Chamber of Commerce of the city has been very active in trying to secure a supply of fresh water. The city of Port Arthur has not sufficient tax values to pay the expense of bringing fresh water to the city, which fact, being recognized by its citizens, they, through the Chamber of Commerce, employed counsel, had the act above referred to introduced in the Legislature, and, under its terms, had the district organized. By taking in the additional territory, the promoters of the district secured property of sufficient tax value on which to base a bond issue of $2,000,000 which was voted by the citizens of the district.

(7) Port Arthur now has a system for distributing fresh water over the city and its suburbs, and it was the purpose of the promoters of the district to bring fresh water to the district and distribute it through the present waterworks system, having its center in Gillam Circle, in the corporate limits of the city of Port Arthur. Also the plans provided for about five miles of water mains in Port Neches, which will supply water to many of the citizens of that town. It has never been the purpose of the promoters of the district, either before its organization or since, to deliver fresh water, at this time, to all parts of the district, but only to the two towns and their suburbs and to such industrial enterprises as may be located in the district at this time or in the future. But, because of the character of the land in the district, it is possible to extend the system, as adopted, to all parts of the district, and to supply water to any enterprise in the district, no matter where located. The costs of such extension would be so great that none of the present rural citizens of the district or the owners of the rural lands could secure any of the water, unless they happened to own lands adjacent to the proposed water main, carrying the water from Port Neches to Port Arthur.

(8) The district is being greatly retarded in its industrial development because of this need of fresh water, and an abundant supply of fresh water would encourage new enterprises and be of great benefit to the present enterprises. Port Arthur and its suburbs would derive great immediate benefit from the fresh water both from its use and from the impetus it would give to its industrial development. Possibly the rural lands would derive no benefit, except that which arises from the prosperity of the industries now in the district and the location of new industries in the district, and the prosperity and growth of the towns in the district. From this it follows that some lands in the district would derive an immense benefit and other lands would derive a very small benefit, which would be reflected in the market and taxable value of the land; that is, the more benefit derived by a piece of land, the higher the market and taxable value.

(9) It was not the purpose of the promoters of the district, before or since its organization, to appropriate all the fresh water to the use of Port Arthur and its suburbs, but the promoters of the district were interested in all the district, and in including the additional territory, while they realized it would be of inestimable value to Port Arthur, it was their purpose that the district should be so managed and the water so distributed as to be of benefit to all parts of the district.

(10) The plan adopted provided for bringing water from Newton county across Orange county to the district at Port Neches, there to be purified and diverted to its use. The contemplated supply is 10,000,000 gallons per day, but the supply can be increased to meet all probable needs.

(11) About 80 per cent. of the voting strength of the district lives in the city of Port Arthur, but there was no evidence that it was the purpose of these citizens, either before the organization of the district or since, to abuse their power to the injury of the other sections of the district.

(12) Salt marshes cover many hundred acres of land in the district, and this land has no present use except for grazing. Because of the proximity of all sections of the district to navigable waters, all of it should be classed as commercial and can be used for commercial and industrial sites.

(13) Many hundreds of acres of land not included in the district will be benefited equally with some of the lands in the district; some in excess of some lands in the district. We find no suggestion in the evidence that any particular piece of land was included in the district only for the purpose of taxation, with no intent that it should be benefited by the results of the additional supply of fresh water. The promoters were not prompted by evil motives nor by a purpose to perpetrate a fraud or injustice on any one by including the two districts within the limits of the district, but having decided on including the two districts, because it was necessary to have values in addition to the values in the corporate limits of the City of Port Arthur, it resulted that many thousands of acres were included which lie two and three and four and five miles and possibly further from either Port Neches or Port Arthur.

(14) There is no evidence that any territory contiguous to the district was excluded because of its voting strength.

As we understand the trial court's conclusions of law and fact, he based his judgment that the district as organized was illegal and void on the following findings, which we take from his conclusions of law and fact and number as indicated:

"(1) While the territory in the proposed district is 47,000 acres, there is only about 6,000 of it that could be said to be within either of the classifications industrial, commercial, or residence property. The rest of the land in the territory, about 41,000 acres, is chiefly grazing land, most of it marsh wastes, and not by any means 'intensely commercial.' A tract of about 5,600 acres, belonging to relator J. M. Hebert, is included which is farm and pasture land in the extreme west and north end on which there are only four dwellings. There are tracts aggregating about 9,000 acres included upon which there is no species of improvements, and for the rest (outside of the ·6,000 .acres of urban and manufacturing tracts) the land is in tracts of about one house to 50 or more acres. Other tracts of smaller size similarly situated to Hebert's tract are included.

"(2) The need for a fresh water supply, such as is proposed, is practically confined to the city of Port Arthur. The Texas Company, which owns about 35 per cent. of the assessed valuations in the proposed district, has provided itself with an abundant supply for its needs at a cost of about $250,000.

"(3) The population of the city of Port Arthur is about 25,000 to 30,000, and in its limits reside about four-fifths of the residents of the proposed district, so that any election is within the control of residents of Port Arthur. The self-interest of the residents of Port Arthur as such will be directly· served by the proposed benefits. The lands of relators Hebert, Whittington, Kitchen, Thomas, and Beaumont are situated at points far removed from any present city or manufacturing site.

"(4) The following allegations are made in the information and established by the preponderance of the evidence: 'The territory included in the so-called district is nine-tenths rural and pasture land and so unsuitable and inappropriate for any community design or plan of fresh water supply for domestic and commercial uses as to render it impossible for any board of supervisors ever to adapt thereto a system of improvements that would be just and reasonable or appropriate; and the control of expenditure therefor is, under the said act, left in the hands of voters, eight-tenths of whom, in the said district, are urban residents thereof, and naturally favorable to such improvements as benefit their city, and naturally opposed to any such as could' be extended to the relators of either of them, if any; and the inevitable result of the scheme is that the parties in interest will be taxed disproportionately to each other and to the benefits conferred, and that the complainants will be taxed without any benefit.'

"(5) The proposed district was clearly not for the purpose of conserving any natural resources nor for reclaiming waste land to any natural use. Its primary purpose was to develop the city of Port Arthur and its environs in and along artificial lines, and the only natural resources intended to be conserved, and which were incidental to that object, were resources wholly outside of the proposed district, being water of a stream in a different watershed, intended to be carried by engineering and mechanical processes under the Neches river into the proposed district, and this was apparent on the face of the petition presented to the commissioners' court.

"(6) The evidence shows that, if all the commercial or industrial plants and residences in the proposed district should be accommodated from the proposed improvements, the contemplated supply of 10,000,000 gallons per day, if available every day, would not suffice, and that the district had only obtained permit from the state board of water engineers to pump that amount for about 200 days in the year.

"(7) * * * But what was done prior to the orders of the commissioners' court shows a design and plan to give to Port Arthur and its suburban additions the advantage of local improvements at the cost of taxation of property of relators, of great assessed value, which could not receive benefit from such improvements as it was possible to make; and the evidence of things done subsequent to the orders of the commissioners' court was admitted and considered merely as corroborative of what preceded.

"(8) The taxes provided for are ad valorem taxes on all the property taxable in the proposed district. Where such taxes are authorized by the Legislature for the purpose of a local improvement, the only way to apportion them equitably is for the Legislature to ascertain or provide for some other body to ascertain what particular land will receive benefit and to exclude the other. Mistakes will happen in such cases even when the best of intentions control, and sometimes property may be included which will receive no benefit. In such cases, no doubt, the courts would uphold the district. But there is here a manifest intention to include vast areas for which no benefit could have been contemplated. It is not even now asserted by the respondents' witnesses that it could receive any benefits other than such as are remote and highly speculative and conjectural, based on improvements of conditions for employment in the city of Port Arthur and the reflection of that in improved market conditions. The evidence as to location and character and uses of the lands is such that I cannot see any reasonable prospect of benefit to property situated like that of the relator J. M. Hebert and many others whose lands are included.

"(9) * * * The selection of territory in this instance is left to the promoters. The act is conceded to leave no discretion to county commissioners in that matter. No provision is made by the act for a hearing on the question of territory to be included. Efforts of Hebert and the others to obtain such a hearing were denied by the commissioners' court, and the promoters concede that the commissioners' court properly construed the act in that respect. It is drawn so as to leave no discretion as to boundaries in any but the promoters themselves. If 'the petition was properly signed and included a name and any boundaries, the commissioners' court were obliged to grant it. The voters could then adopt the proposed district as a whole or defeat it as a whole, but promoters could always so arrange the boundaries that the self-interest of the secure majority would be served by the project and boundaries as fixed by the promoters.

The plan was not to be impeded in execution by any hearing before the commissioners' court as to the equity of including or excluding any particular land. The power thus bestowed on the promoters (if they could be legally intrusted with such power) has been greatly abused by them in this instance, and their act cannot stand."

Respondents have filed assignments of error attacking the court's conclusions of law and fact on which he based his judgment holding the district illegal and void, and relators have filed cross-assignments attacking the judgment of the court holding the act constitutional.

### Opinion.

We believe the trial court erred, both in his findings of fact and conclusions of law, which we shall discuss in the order above given.

[1] 1. This district comprises the acreage found by the court, but we find no support for his conclusion that "only about 6,000 acres of it could be said to be within either of the classifications, industrial, commercial, or residence." This acreage thus named is only about the acreage covered by the two towns in the district and their suburbs. Large bodies of this front upon navigable streams, and have a high value, some of it as high as $1,000 per acre. The land is not now being used for residence, commercial, or industrial purposes, but, as we understand, this district can be used for the purposes named by the court. If the district develops in the future as it has in the past, it will be only a few years until a large portion of the present rural section will be covered by industrial sites. As the district develops and is used for industrial purposes, the unused parts will have an increased valuation. That has been the history of this property in the past, and there is nothing to suggest any change in this increase in values in the future. The benefit need not be direct, but may be indirect, "such as might accrue by reason of general benefits derived by the surrounding community." Special benefits are thus defined in Lipes v. Hand, 104 Ind. 508, 1 N. E. 874:

"Benefits are special when they increase the value of the land, relieve it from a burden, or make it especially adapted to a purpose which enhances its value."

The question of benefits is not to be determined by its present use.

"It has frequently been stated as the rule that in determining whether an improvement does, or does not, benefit property within the assessment district, the land should be considered simply in its general relations and apart from its particular use at the time; and an assessment, otherwise legal, is not void because the lot is not benefited by the improvement owing to its present particular use. The benefit is presumed to inure not to the present use, but to the property itself." 25 R. C. L. 144.

See Georgia Railroad & Banking Co. v. Decatur, 137 Ga. 537, 73 S. E. 830, 40 L. R. A. (N. S.) 935; L. & N. Railway Co. v. Barber Asphalt Paving Co., 197 U. S. 430, 25 Sup. Ct. 466, 49 L. Ed. 819.

[2] As we have stated in our conclusions of fact, the market value of the lands of the district is determined by their availability for commercial and industrial purposes, and the fact that the rural lands do not, and probably will not, receive any of the water brought into the district does not invalidate its organization. Miller & Lux v. Sacramento, etc., 256 U. S. 129, 41 Sup. Ct. 404, 65 L. Ed. 859.

[3] 2. It is true that the Texas Company and the citizens of Port Neches and other citizens of the district, exclusive of those in Port Arthur and, its suburbs, now have an adequate supply of fresh water. The Texas Company has its own waterworks, provided at great cost. But this condition has nothing to do with any issue before the court. The water will be there for their use if they should desire to use it. Their refusal is not a subject of inquiry. Bennett v. City of Emmettsburg, 138 Iowa, 67, 115 N. W. 589. In Atchison v. Price, 45 Kan. 296, 25 Pac. 605, it was said:

"The Legislature has conferred upon the city authorities the discretion and power to provide sewerage facilities, and for that purpose has given them control of the streets and alleys where the sewers are built. They are to determine the necessity for sewers, as well as the character and capacity of those that are required to be built. To allow property owners to decide for themselves whether their lots needed sewerage facilities, or to permit them to provide private ditches, drains, sewers, or cesspools as they might determine to be sufficient, would be wholly impracticable, and would prevent the adoption of a general sewerage system under the control of the city, as the statutes evidently contemplate. The property of those who had built private sewers adjoined upon the new sewer, and we think the district court ruled correctly in holding their property liable to contribute towards the construction of the sewer."

[4] Conservation districts organized under the act are municipal corporations, and are governed by the laws relating to that class of corporations. Wharton County, etc., v. Higbee (Tex. Civ. App.) 149 S. W. 381; Engleman Land Co. v. Donna Irrigation District (Tex. Civ. App.) 209 S. W. 428; Hunter v. Pittsburg, 207 U. S. 161, 28 Sup. Ct. 40, 52 L. Ed. 151; In re Madera Irrigation District Bonds, 92 Cal. 296, 28 Pac. 272, 14 L. R. A.

755, 27 Am. St. Rep. 106. Hence, it seems to us, the authorities above cited are conclusive on the propositon that this conclusion is immaterial to any issue in this case.

[5] 3, 4. The third and fourth findings cover the same points. It is conceded that the city of Port Arthur has a large majority of the voting strength of the district, but this does not raise an issue of fraud or unfair dealing. The presumption is that they will use their franchise honorably and fairly. In 22 C. J. 146, it is said:

"As a general rule, it is proper to indulge a presumption that in their business and social relations all persons act honestly and properly and in good faith. Fraud is never presumed, but, on the contrary, the presumption is always against fraud."

See, also, Manchaca v. Field, 62 Tex. 135; Williams v. Talbot, 27 Tex. 159. There is no evidence in the record to sustain this conclusion. It is based absolutely upon a presumption that the citizens of Port Arthur will abuse their franchise because it might be to their advantage. Under the authorities just cited, such conclusion has no legal support. The district as now developed is unsuitable for any community design or plan of development for distributing the water to all the citizens of the district, and no plan could be devised that would make it possible, within any reasonable cost, to deliver fresh water to the rural citizens of this district. But, if the district is developed, it will be possible to carry water to industrial enterprises in any and every part of the district. As there is nothing to raise an issue against such a finding, we conclude that, notwithstanding the large majority of the voting strength resides in Port Arthur, they will not abuse this strength, but will use it for an equitable and fair division and distribution of the water. But, giving full weight to all the facts found by the court and these two conclusions, the conclusion does not follow:

"That the parties at interest will be taxed disproportionately to each other and to the benefits conferred, and that complainants will be taxed without any benefit."

The authorities cited by us in the first paragraph above destroy this conclusion. While it is true that some of the lands will be disproportionately benefited, that result does not affect the district, because, as said by Judge Phillips in Dallas County Levee District v. Looney, 109 Tex. 326, 207 S. W. 310:

"It would be impossible to create a district in which all the property therein is benefited in the same degree, and the law never demands the impossible."

[6] 5. We cannot agree with the court in its conclusion that "the proposed district was clearly not for the purpose of conserving any natural resource." It was to conserve water, which is certainly a natural resource. No witness testified that "the primary purpose of this district was to develop Port Arthur and its environs along artificial lines." At least relators point out no such testimony in their brief. The uncontroverted testimony is that the purpose of the promoters of this district was to develop all the district. They recognized the need of fresh water in Port Arthur, and they also recognized the needs of the district as a whole, if it is to be developed commercially and industrially.

Much testimony was offered as to whether the district lay within the watershed of the Sabine or Neches rivers. As we deem the court's conclusions on this issue immaterial, we do not discuss the evidence. Also we think his conclusion that the water to be conserved is out of the district and is to be brought into the district immaterial, though relators give great stress and weight to that fact. The water is to be brought from a point on the Sabine river about 20 miles or more from the nearest point to this district. Such conservation we believe to be within the spirit of the amendment. The Constitution does not say that the waters to be conserved must be within the proposed district. The mandate to the Legislature given by Const. § 59, art. 16, is only to pass laws to make effective its provisions. How is left to the judgment of the Legislature. The organization of the district is left to the Legislature. Is a great city to die because it has no water within the limits of a proper conservation district? Can one district deprive another of water by including all the available water within its boundaries, regardless of the excess above its needs? We believe the spirit of the Constitution and of the act was to authorize a conservation district with authority to secure water wherever, in its judgment, its interest would be best served, having, of course, due regard to the interest of other parties.

6. Relators concede in their brief that this conclusion was "of no importance to the result of the trial."

7. There is no basis in the record for this conclusion. All that the promoters did, realizing that they did not have sufficient tax values to bring fresh water to Port Arthur, was to organize a district, as they had a right to do, for the purpose of supplying fresh water to all parts of the district, as its needs might require, having due regard to the cost of such improvement and the benefits conferred. It is not an instance, as the court concludes, where a large portion of the district concluded to tax the balance of the district for their own benefit, with no benefit to the remainder, but where honorable men—there is nothing in the record against that conclusion—honorably decided to use the law

for their benefit, and also for the benefit of all concerned.

8. What we have said above in the main disposes of this finding. We find "no manifest intention to include vast areas for which no benefit could have been contemplated." Because of the peculiar relation of the land of relators to this district, its towns, waterways, commercial and industrial enterprises, and because such facts are almost on all fours with the facts in State v. Kansas City, 233 Mo. 227, 134 S. W. 1026, we here give an extended citation from that case, which, in its logic, in our judgment, destroys this conclusion of the trial court:

"The one important, controlling, and dominant fact which has been proven beyond question by the evidence before us is that all of the lands annexed, whether in the Southern Territory, the Blue Valley, or the East Bottoms, have a largely increased value by reason of, and solely by reason of, their adaptability to present or prospective city uses. No possible explanation on the theory of the prospective tillage of these lands can account for their present high values."

In reference to another tract, the court said:

"The tract of land called the 'East Bottoms,' consisting of between 3,000 and 4,000 acres, as shown by the evidence, is now practically uninhabited and unused. But this level tract of land, skirting the city on the north, lies between the river front on one side and the terminals of four great railway systems on the other. And here again we are confronted with the fact that this waste and unused land is worth from $300 to $1,000 an acre, and if protected against the flood waters of the river, its value would be greatly increased. What gives to these unproductive lands such remarkable values? Is it because of their prospective use for tillage or for city purposes? If the latter, then under the settled law the city has a clear right to include them within its limits, and for that reason alone. If the former, then why have they not been reclaimed under existing levee and drainage laws, when lands far from a city and worth from $10 to $20 per acre throughout the state are being so reclaimed? It is not a satisfactory answer to the inquiry as to the high value of this land to say, as said by relator in the information, 'that the said tract of land is valuable for the production of cotton woods and willows.' The high values placed upon this unused land, as result of the judgment of the investing public, is the most satisfactory evidence which could be submitted as to its prospective use for city purposes."

See, also, the authorities cited under section 1, supra.

[7] 9. The facts detailed in this conclusion are supported by the record, except the conclusion that "the power thus bestowed on the promoters has been greatly abused in this instance, and their act cannot stand." How abused? No land is included that will not be benefited. The selection and designation of the boundaries was not willful and arbitrary, as they accepted the well-recognized boundaries of the school districts, and "it is established by the great weight and preponderance of the evidence that the district as formed, being constituted of the Port Arthur independent school district and Port Neches independent school district, was so formed because the independent school districts were existing entities and adjoining each other, the lands therein being of relatively the same character, similarly situated, and adapted to the same uses" (this being respondents' ninth proposition). The value of the rural land specially mentioned by the court in his conclusions was relatively small compared to its area. In a total valuation of about $37,000,000, the immense Hebert tract was assessed at only $83,000, which, in view of the record, refutes a conclusion that it was included only for the purposes of taxation. On our careful examination of the facts of this record, we conclude that the trial court was in error in holding the organization of this district void under the terms of the act.

[8] We close our discussion of the facts of this case by saying that we find no "resultant operation in fraud of some whose lands are included" in the district, as relators contend, and for that reason Myles Salt Co. v. Iberia Parish Drainage District, 239 U. S. 478, 36 Sup. Ct. 204, 60 L. Ed. 392, L. R. A. 1918D, 190, does not control this case. Then, as the district was formed in the manner provided by the act, the motives and intentions of its promoters are immaterial, and do not affect its legality. State v. Waxahachie, 81 Tex. 626, 17 S. W. 348; Kellum v. Smith, 18 Tex. 843; Franklin Ins. Co. v. Humphrey, 65 Ind. 549, 32 Am. Rep. 78.

This brings us to a consideration of relators' cross-assignments, attacking the constitutionality of the act. On this point they advance the following six cross-assignments:

"(1) The court erred in holding the act of the Legislature in question valid because the said act is void and unconstitutional in this, that it is an attempt to authorize unlimited taxation for the purpose of supplying to districts the local improvement of a water supply for domestic and commercial purposes, whereas unlimited taxation is only authorized for conservation and reclamation of natural resources.

"(2) The court erred in holding said act constitutional because it leaves the district or territory to be defined by promoters without providing for any official apportionment of the taxes to the several tracts of land and owners affected, which apportionment could only be made for the purpose of ad valorem taxes by ascertaining the particular land to be affected by the tax and improvements.

"(3) The said act is unconstitutional and

the court erred in holding it constitutional because it leaves the district to be defined by promoters without giving to affected property or the owners thereof any opportunity to oppose its inclusion, however unjust.

"(4) The said act is unconstitutional and the court erred in holding it constitutional because it depends upon the fifty-ninth section of article 16 of the Constitution, which does not contemplate that the Legislature will either delegate its authority to apportion taxes or abdicate its authority to do so in favor of promoters, and yet wholly fails to fix boundaries or otherwise arrange for benefits to be in any way proportioned to the ad valorem taxes.

"(5) The said act is unconstitutional and void under the state and federal Constitutions and the court erred in holding it constitutional because it is designed to take, and if upheld does take, the property of some persons for the benefit of others, in that it authorizes the districts to be laid off for ad valorem taxation, the taxes to be used in supplying benefits to parts of the taxed district with no possibility of benefit to other parts, which are taxed in the same way as that intended to be and in fact benefited.

"(6) Said act is unconstitutional and the court erred in holding it constitutional because it limits the territory to be incorporated within the boundaries of a county, whereas the Constitution required the limits of the territory to be incorporated to be determined by natural conditions."

Which they support with the following propositions:

"(1) The policy of the state of Texas, as expressed in its Constitution, is to limit the amount of indebtedness which can be incurred and the amount of ad valorem taxes which can be collected by any municipal corporation for any purpose (except reclamation of desert land or flooded lands, or conservation of natural resources, of a territory), and the attempt to organize a corporation having the power to create debts unlimited in amount and levy unlimited ad valorem taxes merely for the purpose of improving a public utility of an already prosperous city and its 'intensely commercial' environs is opposed to that Constitution.

"(2) Under proper construction of section 59 of article 16 of the Texas Constitution the boundaries of districts authorized to be organized and supported by ad valorem taxation should be determined by natural conditions, related to the objects of conservation and reclamation, and any legislation which authorizes such unlimited taxation and unlimited bonded indebtedness in districts limited by such purely arbitrary and artificial boundaries as county lines is excluded.

"(3) The idea that promoters, whether organized into a board of trade or merely acting together, in a territory of their own selection, may use the political machinery of the state to subject the lands of others to taxes ad valorem to carry out their ambitious purposes, without reference to any corresponding benefit in return for such taxation, and without opportunity for exclusion of any land from their scheme of taxation, is opposed to the requirement that taxes be levied only for public purposes.

"(4) For the political machinery of state to be used by promoters to take unlimited taxes from owners of remote rural property to afford the distinctly urban improvement of a domestic and commercial water supply of a city and its intensely commercial and industrial environs, without any opportunity for such owner of rural lands to be heard in opposition to the inclusion of his lands, is opposed to the Constitution on the United States, forbidding that any state should deprive any person of property without due process of law, and a statute purporting to authorize such a course is therefore invalid.

"(5) A state cannot authorize the taking of unlimited ad valorem taxes from lands of a district for a supposed improvement thereof without either fixing the limits of the district or providing for some fair and just means of protecting the interests of property owners against the cupidity of promoters who have the fixing of boundaries left to them, and such an act of the Legislature of the state cannot be upheld under complaint of a property owner that it has been or is being applied so as to deprive him of property without due process of law in violation of the federal and state Constitutions."

We do not believe that relators' cross-assignments of error are well taken, for the following reasons:

[9] (1) Section 59, art. 16, of our state Constitution directs the Legislature to pass all such laws as may be neccessary for the "conservation * * * of the natural resources of this state, including * * * the waters of its rivers * * * for irrigation, power and all other useful purposes." As the Constitution, in the article cited, defines conservation as "the * * * distribution of * * * the waters of its rivers * * * for useful purposes," we are bound by the definition thus given (29 Cyc. 1105; Snyder v. Compton, 87 Tex. 374, 28 S. W. 1061), and any further discussion of that term is academic. The purposes of this act, as expressed in its title and in its body, is "conservation," as defined by the Constitution. As the purpose of this act is "conservation," it comes within the constitutional grant of authority, as defined by relators in their proposition:

"Under the present frame of our state Constitution unlimited ad valorem taxation is tolerated for and restricted to the objects of conservation and reclamation."

Which they support with Dallas County Levee District v. Looney, supra, and Taylor v. Boyd, 63 Tex. 540.

[10, 11] (2) There is nothing in section 59, art. 16, of the Constitution giving direction to the Legislature as to how conservation districts shall be organized, nor limiting the boundaries of such districts. There is no

suggestion that county lines or the lines of any other political subdivision shall be considered in establishing such districts. The only direction is that "the Legislature shall pass all such laws as may be appropriate" to effectuate its purposes. In following this direction, it was for the Legislature to determine how the district should be organized and how the boundaries should be determined, and, unless it appears "beyond a reasonable doubt" that the Legislature has exceeded its constitutional grant of authority, we must hold the act constitutional. "A reasonable doubt must be resolved in favor of the legislative action and the act sustained." Cooley on Constitutional Limitations, cited with approval by the Supreme Court in Smith v. Patterson (Tex. Sup.) 242 S. W. 749. See, also, Brown v. Galveston, 97 Tex. 12, 75 S. W. 488; Koy v. Schneider (Tex. Sup.) 218 S. W. 482.

(3) Relators restate their third proposition as follows:

"Taxation can only be levied for public purposes, and therefore an act authorizing a district to be organized to include territory selected by promoters, without any means provided for review of their selfishly localized acts of discrimination, is unconstitutional"—citing in support thereof article 8, § 3, and article 3, § 52, of the Constitution of Texas; Guest v. Brooklyn, 69 N. Y. 506; City of Hutchinson v. Leimbach, 68 Kan. 37, 74 Pac. 598, 63 L. R. A. 630, 104 Am. St. Rep. 389; 12 C. J. 842; Dillon, Municipal Corp. (5th Ed.) p. 2576, § 1443 (761) 4.

[12] The Constitution provides that "taxes shall be levied and collected * * * for public purposes only" (section 3, art. 8), and "the Legislature shall have no power to authorize any * * * political corporation or subdivision of the state to lend its credit * * * · to any individual [or] association" (section 52, art. 3). It was not the purpose of the amendment of 1917 (section 59, art. 16) to limit the effect of the provisions just quoted, and, if the act contravenes these provisions, we must hold it void. It cannot be seriously questioned that the purpose of this act, as expressed in its title, as well as in its body, is to serve the public. It comes clearly within the strongest possible definition of "public purposes," as that term is used in the Constitution. The act itself purports to conserve the water for the district, the entire citizenship of the district, and not for any particular individual. Even though in its operation certain individuals may derive a special benefit, its "public purpose" is not destroyed. In re Bonds Madera Irrigation District, supra; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 381; Hester & Roberts v. Donna Irrigation District (Tex. Civ. App.) 239 S. W. 992.

We cannot follow relators in their contention that the taxes are for private use, because promoters select the territory to be included in the district "without any means provided for review of their selfishly localized acts of discrimination." It is the public policy of this state, grounded in the Constitution and legislative acts, that the organization of districts for special purposes shall rest on the initiative of those to be affected. If the authority vested in the promoters is abused, our courts have authority to nullify their act. The act is not unconstitutional because the Legislature did not define what would constitute a fraud on the citizenship of the proposed district. It had the authority to make such a definition a part of the act, but the omission does not make the act unconstitutional. The courts, under their common-law powers, can redress all such wrongs. This is recognized by the Supreme Court of this state in Ewing v. State, 81 Tex. 172, 16 S. W. 872, where it is said:

"So also, if the Legislature had provided that the cities proposing to incorporate under the general laws should be empowered to embrace territory lying beyond their actual limits, it may be that, in the absence of clear abuse of the power, it would be the duty of the courts to respect the legislative will, and to hold an incorporation including such additional territory valid. But, as we construe the law, no such power has been granted."

See, also, Dallas Levee District v. Looney, supra, and Gast Realty Co. v. Schneider, etc., 240 U. S. 55, 36 Sup. Ct. 400, 60 L. Ed. 1239.

[13] Nor, by giving the promoters power to fix the boundaries without providing for a review of their act, has the Legislature delegated to them "legislative powers." The Legislature has only enacted "conditions upon performance of which the corporation shall be regarded as organized with the powers mentioned and described." Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369. That case is very much in point on the propositions discussed with the issue before us. On this issue we believe respondents have correctly stated the law in their fourth counter proposition, which is as follows:

"The Constitution authorizes the creation of conservation and reclamation districts, leaving the mode and manner of their creation to the Legislature. Such districts may be created directly by the Legislature, the state being divided into districts with boundaries defined by the Legislature, or they may be created in the manner adopted by the Legislature in the act in question, i. e., a general law defining the rights and powers of such districts, the law to become applicable in any part of the state within boundaries defined in the manner prescribed in the act when a majority of the qualified

property tax paying voters, residing within such boundaries, through an election held in the manner provided, determine to accept the provisions of the act. .By whichever method the district is established, it is created by the Legislature, and the Legislature, through the general law, does not delegate to the people its legislative power."

See Fallbrook Irr. Dist. .v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; Houck`v. Little River Drainage Dist., 239 U. S. 254, 36 Sup. Ct. 58, 60 L. Ed. 266; Re Bonds Madera Irr. Dist., 92 Cal. 296, 28 Pac. 272, 675, 14 L. R. A. 755, 27 Am. St. Rep. 106; Werner v. City of Galveston, 72 Tex. 22, 7 S. W. 726, 12 S. W. 159; Johnson v. Martin, Wise & Fitzhugh, 75 Tex. 33, 12 S. W. 321; Spears v. City of San Antonio (Tex. Sup.) 223 S. W. 166.

[14] Relators thus summarize their fourth and fifth propositions, as given above:

"A state attempts to deprive persons of property without due process of law, in violation of the Constitution of the United States, where it authorizes private promoters to lay off a district and they lay it off with unalterable territory of their own free and unrestricted selection and have all the lands in it subjected to ad valorem taxation for the purpose of providing a direct benefit which they may. secure localization of at some point in the district"—citing Norwood v. Baker, 172 U. S. 269, 19 Sup. Ct. 187, 43 L. Ed. 443; Fallbrook, etc., v. Bradley, supra.

Had the Legislature fixed the boundaries of this district or of all. possible conservation districts in the state authorizing them to levy and collect an ad valorem tax, its act would have been upheld, unless "so arbitrary and unfair as to amount to a plain abuse of legislative power.". Dallas County Levee District v. Looney, supra. Or, as said by the Supreme Court of the United States in the case of Gast Realty Company v. Schneider, etc., supra, unless "its action is palpably arbitrary and a plain abuse." See, also, Farnham on Waters, p. 1007; 12 C. J. 1257. It follows from ·these authorities that the courts have the power to review the facts of all districts organized under this act, and, if the promoters have clearly abused their power, to declare the districts void, thus obviating the necessity of declaring a solemn act of the Legislature unconstitutional. As we understand the law of this state, the relators were given the right to as full and complete a hearing as if such right had been specially granted in the body of the act itself.

Under authority of section 59, art. 16, of the Constitution, the Legislature could not provide for the organization of a conservation district and for the issuance by it of bonds, with authority to levy and collect taxes, unless such taxes are "equitably dis-

tributed." In Dallas County Levee District· v. Looney, supra, the Supreme Court defined the term "equitably distributed" as meaning that the tax laid must be fairly proportioned, according to benefits received. Discussing this issue, the court said:

"The measure of benefit that will accrue to property from a local improvement is, at best, but an approximation, and hence there is no general principle of constitutional law .that in the imposition of such taxes limits the legislative power to the exact amount of pecuniary benefit which the particular property derives. While .in some instances the benefit may be generally distributed throughout the district, in others it may .be more confined."

Continuing the discussion, Judge Phillips, speaking for the court, said:

"Two methods ·are generally availed of for the apportionment of such taxes. One is the appointment of commissioners with authority to examine the district and apportion the tax according to their determination of the benefits that will be received. This is characterized as the assessment of net benefits to the property and a corresponding apportionment of the taxes, and is the method which the Attorney General contends may alone be prescribed by the Legislature under this amendment. The other is a determination by the Legislature itself that the benefits will be in proportion to value, area, or frontage, and apportionment accordingly. Cooley on Taxation, 416,. 1205. The first may be the fairer method, but, in the absence of express constitutional provision for a different rule, either is permissible. Id. 416."

Again speaking on the question of ad valorem taxation, as a method of providing for the cost of local improvements, he said, in this same case:

"It cannot be said as a matter of law that a rule which apportions taxes of this character according to the value of the property affected is one plainly arbitrary and unfair. It is a veteran rule for the. apportionment of property taxes, sanctioned by immemorial usage and universally applied. It is the one most familiar to the people. Its general justice is not open to challenge. It is an approved method for the apportionment of taxes of this kind. Its adoption was a matter of legislative discretion."

Then this act, providing for ad valorem taxation, is not "as a matter of law"· unconstitutional. Each district organized under its terms must rest on its own facts, and, as we have already said, if ,the promoters abuse that power, the district can be annulled.

Nor is the act unconstitutional because districts can be organized under its terms in which all the property included will not be equally benefited. Property of immense value might receive relatively a small benefit, while

property of a relatively small value might receive a large benefit. Hester & Roberts v. Donna Irrigation District, supra. See, also, Judge Phillips' statement on this question as above given from Dallas Levee District v. Looney.

Nor is the act unconstitutional because it makes no provision for a hearing as to benefits on an ad valorem assessment. When the cost of a local improvement is to be met by an ad valorem tax, the constitutional guaranty of property rights is satisfied when a hearing as to the value of the property to be taxed is given, provided such taxes are "equitably distributed" as required by section 59, art. 16, of the Constitution, which showing has been made in this case. Wharton County Drainage District v. Higby, supra; White v. Fahring, 212 S. W. 193. Directly in point on this proposition is Hagar v. Reclamation District, 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 572, where it is said:

"But where a tax is levied on property, not specifically, but according to its value, to be ascertained by assessors appointed for that purpose upon such evidence as they may obtain, a different principle comes in. The officers, in estimating the value, act judicially, and in most of the states provisision is made for the correction of errors committed by them, through boards of revision or equalization, sitting at designated periods provided by law, to hear complaints respecting the justice of the assessments. The law, in prescribing the time when such complaints will be heard, gives all the notice required, and the proceeding by which the valuation is determined, though it may be followed, if the tax is not paid, by a sale of the delinquent's property, is due process of law."

Again, in Webster v. Fargo, 181 U. S. 394, 395, 21 Sup. Ct. 623, 624 (45 L. Ed. 912), it is said:

"But we agree with the Supreme Court of North Dakota in holding that it is within the power of the Legislature of the state to create special taxing districts, and to charge the cost of a local improvement, in whole or in part, upon the property in said district, either according to the valuation or superficial area or frontage, and that it was not the intention of this court, in Norwood v. Baker, to hold otherwise."

This act provides for a hearing as to value before the board of equalization, and thus fully complies with the Constitution of this state and the Fourteenth Amendment to the Constitution of the United States.

As the district was formed in strict compliance with provisions of the act, we believe that the constitutionality of the act and whether the promoters acted unfairly in including relators' property within the district are the only issues that should be considered in this proceeding by information in the nature of a quo warranto. State v. De Gress, 53 Tex. 387; 22 R. C. L. 656, 659, 668, 697, 717; 32 Cyc. 1425. That the constitutional question can be raised in this proceeding, see State v. Osborn, 51 Pac. 837; Taylor on Municipal Corporations, § 1556; Brennan v. Bradshaw, 53 Tex. 336; Tomlinson v. Williamson (Tex. Civ. App.) 243 S. W. 287. That the unlawful inclusion of territory can be reviewed, see Judd v. State, 25 Tex. Civ. App. 418, 62 S. W. 543. Also, on our finding that the promoters did not act unfairly, nor in fraud of the rights of relators by including their property within the district, we believe they were not injuriously affected nor deprived of a constitutional right in the organization of the district, and for that reason were not in position to raise the constitutional question. 12 C. J. 760, § 177.

But all the questions discussed by us are fully briefed by both parties, and, as a writ of error will lie from our judgment in this case to the Supreme Court, we have thought it best not to rest the case on the two propositions last announced, but to decide all questions raised, and thus present all issues for review by writ of error.

For the reasons above given, judgment of the trial court is reversed, and judgment here entered in favor of respondents, declaring the district legal and valid in all respects.

Reversed and rendered.

### On Rehearing.

As we understand the assignments advanced by relators on this rehearing, their main contention is that the act is unconstitutional, because it contains no provision for a hearing as to benefits on an ad valorem assessment. In holding against this contention of relators, we said, in our original opinion:

"If the authority vested in the promoters is abused, our courts have authority to nullify their acts. The act is not unconstitutional because the Legislature did not define what would constitute a fraud on the citizenship of the proposed district. It had the authority to make such a definition a part of the act, but the omission does not make the act unconstitutional. The courts, under their common-law powers, can redress all such wrongs. * * *

"It follows from these authorities that the courts have the power to review the facts of all districts organized under this act, and, if the promoters have clearly abused their power, to declare the districts void, thus obviating the necessity of declaring a solemn act of the Legislature unconstitutional. As we understand the law of this state, the relators were given the right to as full and complete a hearing as if such right had been specially granted in the body of the act itself."

In their reply to relators on this issue, respondents have cited to us the Kentucky

Railroad Tax Cases, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414, where it is said:

"And this is the principle that was followed in the subsequent case of Hagar v. Reclamation District, 111 U. S. 701 [28 L. Ed. 569]. In that case the statute of California, which conferred the jurisdiction, authorized any defense, going either to the validity or to the amount of the tax assessed, to be pleaded. What inquiries may be permitted in such cases, of course, is a matter that depends upon the particular provisions of the law of the jurisdiction. In the absence of such provisions, and as a principle of general jurisprudence, it is safe to say that any defense is admissible which establishes the illegality of the proceeding resulting in the alleged assessment, whether because it is in violation of the local law which is relied on as conferring the authority upon which it is based, or because it constitutes a denial of a right secured to the party complaining by the Constitution of the United States. The judgments now under review were rendered in just such actions, so that we cannot escape the conclusion that there is no ground for the plaintiffs in error to contend that they have been rendered without due process of law."

It seems to us that the proposition thus announced is directly in point on the question presented and urged by respondents, and sustains fully our conclusion. "Under their common-law power," as we have said, or under the "principle of general jurisprudence," as the Supreme Court of the United States has said, the courts of this state have, in fact, given relators a full and complete hearing on all the facts entering into the organization of fresh water supply district No. 1 of Jefferson county and the inclusion of their property in said district. No grant of right by the Legislature could have enlarged the hearing which relators have had. Is there any reason why the courts of this state should not exercise this jurisdiction inherent in our "general jurisprudence"? Its exercise avoids "the necessity of declaring a solemn act of the Legislature unconstitutional." Again, relators have been given a full hearing on the issue as to whether the taxes levied on the property of the district are "equitably distributed," as required by section 59, art. 16, of the Constitution of this state. Relators may have a full hearing before the board of equalization on all issues as to the value of their property.

If we are correct in what we have just said, relators are fully protected in all their property rights, and this act violates neither the federal Constitution nor the Constitution of this state. As we understand the authorities cited by us in our original opinion, they fully sustain all we have said.

The motion for rehearing is overruled.